# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

MOORE, et al.,

  *Plaintiffs*,

  v.

CITY OF JERSEY CITY, et al.,

  *Defendants*.

Civil Action No. 20-19621

OPINION

**ARLEO, UNITED STATES DISTRICT JUDGE**

  **THIS MATTER** comes before the Court by way of Defendants the City of Jersey City's ("Jersey City"), and Michael Jacobo's, Raymond Vazquez's, Crisant Bereguette's, and Jocelyn Roldan's (collectively, with Jersey City, "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. ECF No. 42. Plaintiffs Devonte Moore ("Moore") and Shaquan Rush ("Rush," and with Moore, "Plaintiffs") oppose the Motion. ECF No. 46. For the reasons set forth below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND[1]

The allegations in this case stem from an unfortunate encounter between Plaintiffs and three officers of the Jersey City Police Department on the evening of July 1, 2019, while the officers were engaged in routine patrol. That night, after hearing possible gunfire and seeing three individuals running past them, the police officers encountered Plaintiffs, observed "muzzle flashes," and, believing that Plaintiffs were about to shoot firearms, discharged their weapons. Plaintiffs' "firearms" turned out to be fireworks. Plaintiffs, who were shot but survived, now assert claims against Defendants for violations of federal and state civil rights laws and state law tort claims.

### A.    The Shooting Incident

#### i.    Patrolling Officers' Account

In July of 2019, Lieutenant Crisant Bereguette ("Bereguette"), Officer Michael Jacobo ("Jacobo"), and Officer Raymond Vazquez ("Vazquez," and collectively, the "Patrolling Officers") were assigned to the Jersey City Police Department ("JCPD") housing unit ("Housing

---

[1] Plaintiffs' responses to facts presented by Defendants fail to comply with Local Rule 56.1 of the United States District Court for the District of New Jersey. Local Rule 56.1 requires that a motion for summary judgment made pursuant to Federal Rule of Civil Procedure 56 be supported by "a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, "addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." Id. Additionally, "[e]ach statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law." Id. Under Local Rule 56.1, facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.

Plaintiffs' opposition to Defendants' Motion consists of a single brief, ECF No. 46, which includes a "Counter Statement of Facts" section ("Pls.' CSOF"), id. at 1–4, and an "Uncontradicted Facts" section ("Pls.' UF"), id. at 7–8. Among other issues, Plaintiffs do not "[cite] to the affidavits and other documents submitted in connection with the [Defendants' summary judgment] motion." See L. Civ. R. 56.1. However, the Court will not automatically deem all facts contained in Defendants' Undisputed Statement of Material Facts ("Defs.' SOMF"), ECF No. 42.16, as "admitted." The Court has looked at the parties' respective exhibits to substantiate their assertions and has summarized the background information in Part I of this Opinion based on what the evidence reflects. See, e.g., Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 614 (3d Cir. 2018) (affirming the District Court's "full analysis [of the record] to determine whether granting summary judgment was appropriate").

Unit").[2]  See Defs.' SOMF ¶¶ 16, 34, 42.  At the time, Jacobo and Vazquez were partners and reported to Bereguette.  Id. ¶ 34.

On the evening of July 1, 2019, Bereguette directed the Patrolling Officers to police the Arlington Gardens apartment complex ("Arlington Gardens")[3] by foot.  Bereguette Dep. Tr. at 67:1–5, ECF No. 42.7.  Bereguette chose Arlington Gardens because it "had been one or two days since [Bereguette] had gone to Arlington Gardens," which has "had issues with people sleeping in the stairways [and] some alleged drug dealing going on within the building."  Defs.' SOMF ¶ 18; Bereguette Dep. Tr. at 67:1–13.  Jacobo recalled that he previously patrolled Arlington Gardens in response to complaints about "noise [], people sleeping in the hallways, [and] people trespassing."  Jacobo Dep. Tr. at 26:13–24, ECF No. 42.8.

Bereguette knew of Randolph Avenue, which runs parallel to Arlington Gardens, as a "gang location" where "gang violence" and "shootings" occurred.  Defs.' SOMF ¶ 21; Bereguette Dep. Tr. at 72:6–17.  Vazquez knew of Harmon Street, which is approximately one block from Arlington Gardens, as a location where the JCPD previously received calls about "shots fired."  Defs.' SOMF ¶ 43; Vazquez Dep. Tr. at 25:17–23.  Vazquez perceived the "neighborhood" as a "high crime area."  Vazquez Dep. Tr. at 25:19–21.

At some unknown time prior to this incident, Bereguette recalled seeing a JCPD bulletin advising police officers that fireworks may be used during holiday seasons to mask the sound of gunshots.  Defs.' SOMF ¶ 20; Bereguette Dep. Tr. at 69:14–70:22.  Jacobo similarly recalled

---

[2] The Housing Unit visits "different housing complex[es] throughout Jersey City and [] patrol[s] those for any quality of life issues . . . ."  Vazquez Dep. Tr. at 23:8–15, ECF No. 42.9.

[3] Arlington Gardens is a non-federal affordable housing development managed by the Jersey City Housing Authority. It is located between Arlington Avenue and Randolph Avenue in Jersey City, New Jersey.  See, e.g., Jersey City Housing Authority, Community Information, Arlington Gardens, https://www.jerseycityha.org/community-information (last visited Nov. 5, 2024).

situations where JCPD received calls about "shots fired," but upon further investigation, the source of noise prompting the complaints was fireworks, and vice versa. Jacobo Dep. Tr. at 29:6–11; see also id. at 29:20–30:9 (describing finding shell casings at a scene where they were called in response to a fireworks complaint).

None of the Patrolling Officers recalled receiving complaints of fireworks on the day of the shooting. See Bereguette Dep. Tr. at 73:6–8; Jacobo Dep. Tr. at 32:1–4; Vazquez Dep. Tr. at 31:16–32:10. Leading up and immediately prior to the shooting, Bereguette did not recall receiving any radio calls. Bereguette Dep. Tr. at 73:2–5. But each of the Patrolling Officers conceded awareness that fireworks were used in Jersey City around Independence Day. See Bereguette Dep. Tr. at 71:20–24; Jacobo Dep. Tr. at 27:22–28:18; Vazquez Dep. Tr. at 28:1–9.

At or around 10:15 PM,[4] the Patrolling Officers exited their respective cars and began walking towards Arlington Gardens to conduct their patrol. See Defs.' SOMF ¶¶ 36, 46. Before they were able to enter any buildings, Bereguette heard "loud discharges," which he believed to be either "possible gunshots" or "fireworks." See, e.g., Bereguette Dep. Tr. at 79:16–80:5; see also id. at 67:14–68:5, 78:8–17. Although Jacobo testified that he is generally unable "to determine what is fireworks and what [is] gunfire," see Jacobo Dep. Tr. at 29:20–30:9, he heard "popping" sounds, which he believed were fireworks, Defs.' SOMF ¶ 36; see also Jacobo Dep. Tr. at 32:16–19. Vazquez similarly claims he is generally unable to "distinguish what a gunshot sounds like versus a firework," Vazquez Dep. Tr. at 43:13–16, and "wasn't sure" whether the "pops" he heard were gunshots or fireworks, Defs.' SOMF ¶ 46; see also Vazquez Dep. Tr. at 43:4–44:5.

---

[4] See Vazquez Dep. Tr. at 37:8–10 (recalling having arrived at Arlington Gardens at "roughly [10:00], 10:15 pm"); Bereguette Dep. Tr. at 114:2–14 (recalling that the incident occurred "sometime within the 10:00 to 11:00 timeframe"); Pls.' UF at 7 ("It is conceded that the shootings occurred at approximately 10:15 P.M.").

The Patrolling Officers moved toward the source of the noise to investigate. Bereguette Dep. Tr. at 77:20–23. At this point, each of the Patrolling Officers observed three individuals run past them. See Defs.' SOMF ¶¶ 19, 23, 36, 46. Vazquez perceived the individuals as "running away from something," which "heighten[ed his] level . . . into thinking that this could be a possible dangerous situation." Vazquez Dep. Tr. at 45:19–46:5. Bereguette also perceived the individuals to be "trying to get away from something." Bereguette Dep. Tr. at 80: 18–22. Jacobo perceived the individuals as not "looking [] joyful," and believed "the life of the people running past [him] were in danger." Jacobo Dep. Tr. at 32:19–25, 43:18–44:1.

The facts that follow occurred in a short amount of time, with each of the Patrolling Officers offering their respective accounts of the incident.

### 1.    Bereguette

Bereguette then observed a fourth individual—later identified as Moore—"come out" "pointing" an unknown object that he held in his hand. Defs.' SOMF ¶ 23; Bereguette Dep. Tr. at 80:23–81:2. Next, Bereguette perceived "muzzle flashes" originating from the unknown object. Id. With the awareness that he was patrolling an area known "for gun violence in the past," Bereguette concluded that "these were probably gunshots" and that he was witnessing "people running away from a person shooting at them." Id. at 84:7–23.

At that point, Bereguette recalls raising his firearm. Id. at 84:14–85:4. He then saw Moore point the unknown object "towards" him. See id. at 85:12–19. Fearing that the unknown object might be a weapon and that he was about to be shot, Bereguette discharged his firearm at Moore. Defs.' SOMF ¶ 26; Bereguette Dep. Tr. at 86:24–87:3.

Bereguette did not announce his presence as a police officer to Moore, nor did he verbally command that Moore stop or drop the object. Bereguette Dep. Tr. at 87:4–25. Bereguette claims

that the "quickness of the action" prevented him from issuing verbal commands, and that he was "[n]ot close enough" to order Moore to stop or drop the object. Id. Bereguette concedes that he did not "definitive[ly]" recognize the unknown object held by Moore as a weapon. See id. at 85:20–86:3. Bereguette recalled that Moore continued "standing and firing," so Bereguette "kept discharging [his firearm] until [the threat] stopped," which to him meant discharging his firearm until Moore "dropped to the ground." Id. at 90:25–91:2, 91:6–14.

Just prior to Moore falling to the ground, Bereguette "perceived [a] second actor coming into the frame." Id. at 91:15–20. Bereguette observed "muzzle flashes" originating from the second individual—later identified as Rush. Id. at 91:21–25. As a result, Bereguette discharged his firearm twice at Rush, who then "disappeared back behind [a] building." Defs.' SOMF ¶ 27; Bereguette Dep. Tr. at 91:15–92:6, 93:1–4. Ultimately, Bereguette discharged his firearm until its magazine was empty. See Bereguette Dep. Tr. at 88:16–89:1. Bereguette did not perceive anyone else outside or nearby prior to or during the incident. See id. at 94:25–95:7.

### 2.    Jacobo

After witnessing the three individuals run past him, Jacobo turned his attention to the initial source of noise and saw a fourth individual—later identified as Moore—"with his hand pointed out coming across the building" and flashes coming out of what Jacobo believed to be the muzzle of a weapon. See Defs.' SOMF ¶ 36; Jacobo Dep. Tr. at 32:24–33:11. When he saw the "muzzle flashes," Jacobo initially believed that Moore "was aiming at the three people [] running past [him]." Jacobo Dep. Tr. at 43:7–12. He recalled "then at some point the muzzle flashes . . . turned towards [his direction]," at which point he believed his life was in danger. Id. Jacobo "tensed up, drew [his] weapon, and starting firing." Id. at 32:24–33:11.

6

Jacobo "stopped firing as soon as the muzzle [and/or Moore's] hand went down," which Jacobo perceived to mean "the threat was over." Id. at 33:12–14, 37:23–38:5; see also Defs.' SOMF ¶ 37. After witnessing Moore "put his hand down," Jacobo observed him "run[] to the right," where Jacobo lost track of him. Jacobo Dep. Tr. at 40:2–12. Like Bereguette, Jacobo did not announce his presence as a police officer to Moore, nor did he verbally command Moore to stop or drop the perceived weapon. See id. at 50:10–23. Jacobo did not testify that he saw or shot at a second individual. See generally Jacobo Dep. Tr.; Defs.' SOMF. Jacobo also did not search for or recover a gun at the scene. Jacobo Dep. Tr. at 39:8–14.

### 3. Vazquez

Vazquez similarly witnessed the three individuals "running up" and "running away," after which followed a fourth "individual . . . from behind [a] building . . . with his arm extended." Vazquez Dep. Tr. at 40:19–41:6. Vazquez then perceived this individual—later identified as Moore—extending his arm towards him. Id. at 53:4–6. Vazquez reported seeing "a flash [and] hear[ing] a pop," see id. at 41:1, followed by a second "flash" and "pop," see id. at 41:3; see also id. at 52:3–9. He next observed Moore "turn[] towards Lieutenant Berguette and Jacobo [and] their location," and observed a third "flash" and "pop." Id. at 41:1–3, 52:10–12. Vazquez estimated that Bereguette, who was in front of him, was approximately ten to fifteen feet away from Moore. See id. at 51:17–24.

Vazquez witnessed Bereguette unholster and discharge his firearm in the direction of Moore. See id. at 52:3–12. At that point, Vazquez believed that Moore was holding and discharging a firearm. Id. at 53:12. As a result, Vazquez removed his own firearm from its holster. Id. at 54:16–25. Believing that "the individual who had his arm extended at [him] had a weapon in his hand and [] was firing in the area of Lieutenant Bereguette and Jacobo," Vazquez began

7

discharging his firearm in the direction of Moore. Id. Vazquez recalls discharging his firearm four or five times. Id. at 65:1–3. He stopped firing when Moore "start[ed] to run towards [his] right" and "out of [his] view." Id. at 68:3–13; see also id. at 68:14–18 ("I believe there wasn't a threat any more after he ran away.").

Vazquez estimated that the entire incident lasted less than twenty seconds. Id. at 57:18–20. At the time of the shooting, Vazquez was not able to determine whether he had hit Moore. Id. at 67:18–21. Like Bereguette and Jacobo, Vazquez did not announce his presence or issue any verbal commands. Id. at 50:25–52:2.

At no point during the incident did Vazquez perceive a "second actor." Id. at 71:16–18. Additionally, he could not recall seeing anyone outside or nearby prior to or during the incident. Id. at 117:6–24.

### ii.    Plaintiffs' Account

On the evening of July 1, 2019, Moore and Rush planned to meet friends at or around Arlington Gardens. See, e.g., Moore Dep. Tr. at 66:9–67:2, 69:3–21, ECF No. 42.12. In celebration of the Independence Day holiday, Plaintiffs and their friends planned to ignite "Roman Candles," a type of handheld firework. Pls.' CSOF at 1, 3; Rush Dep. Tr. at 45:23–46:7, ECF No. 42.13. Moore has celebrated Independence Day in years prior and knows that "[e]verbody [does] fireworks in Jersey City." Moore Dep. Tr. at 134:18–135:12; see also id. at 74:18–19 ("Everybody played with Roman Candles around this time."). According to Rush, it was common for Plaintiffs to use fireworks around Independence Day. Rush Dep. Tr. at 43:12–22.

As of July 2019, Moore did not believe Arlington Gardens to be a violent area. See Moore Dep. Tr. at 83:25–84:17. Moore testified that, at the time, there were no shootings around Arlington Gardens. See id.; see also id. at 138:12–14 ("I was even surprised I've seen cops really

at that area.  There was nothing happening around that area.").  Moreover, Moore was not aware of any gang activity out of Arlington Gardens "because everybody was locked up around that time."  Id. at 84:13–17.

On the night in question, Plaintiffs planned to play a "game" with their friends that involved chasing each other with Roman Candles.  See Pls.' CSOF at 3; see also Rush Dep. Tr. at 52:10–16, 55:19–21, 67:1–15; Moore Dep. Tr. at 74:23–25, 75:10–17.  According to Moore, the Roman Candles used by Plaintiffs were a "little over a foot" long, looked "[l]ike a little stick," and "shot out sparkles."  Moore Dep. Tr. at 72:4–73:3; see also id. at 73:4–5 ("It shoots and it goes poof and it goes (brrrr) like a little sparkle.").

With the Roman Candles in their possession, Plaintiffs were driven to Arlington Gardens.  See, e.g., Rush Dep. Tr. at 46:20–48:6.  Moore claims he exited the car on the corner of Bramhall Avenue and Arlington Avenue.  See Moore Dep. Tr. at 67:12–15, 77:19–22, 78:7–79:4.  According to Moore, this general area is "very dark" and not "well-lit."  Id. at 138:21–139:11. Upon exiting the car, Moore held one Roman Candle in each hand.  Id. at 78:7–22.  With one lit, Moore started walking down Arlington Avenue.  Id. at 78:24–79:4.

Rush claims he exited the car after Moore at or around Harmon Street—approximately one block away from Moore, see Rush Dep. Tr. at 48:3–6, so Plaintiffs could "strategic[ally]" surround others participating in the game, see Moore Dep. Tr. at 77:23–78:6, 94:15–95:2.  After exiting the car, Rush lit his Roman Candle.  Rush Dep. Tr. at 48:7–11.  Once he began shooting his Roman Candle, he heard what he perceived to be other fireworks.  Id. at 49:17–22.  Rush now believes that these were actually the sound of gunshots.  See id.  According to Rush, he and Moore did not point their Roman Candles at anyone but opted to "point[] it in the sky" because their friends had already run away.  Id. at 52:17–53:2.

Moore recalls that he walked for approximately three or four minutes before suddenly being shot at by the Patrolling Officers, though at the time, he was unaware of the source of the gunshots. Moore Dep. Tr. at 82:6–83:7. At first, Moore did not realize he had been shot, but instead thought he was hit by a Roman Candle. See id. at 68:3–11, 92:11–20. After being shot in his knee, Moore dropped both of his Roman Candles on the ground, which ignited one. Id. at 106:10–15. According to Moore, he did not point his Roman Candle in the direction where the Patrolling Officers were standing. Id. at 147:12–16. He also does not believe that his Roman Candle fired until after he was shot. Id. at 67:22–68:2.

Moore was shot three times: twice while he was standing, and once while he was on the ground. Id. at 68:1–13, 140:7–22. The bullets hit Moore's knee, thigh, and posterior. Pls.' CSOF at 2. Thereafter, Moore ducked behind a nearby car, where he continued to hear bullets hitting the car "rapidly." Moore Dep. Tr. at 140:23–141:5. Prior to being shot, Moore claims he did not see any of the individual Patrolling Officers, but that he did observe a police vehicle nearby. Id. at 82:20–83:7. According to Moore, the Patrolling Officers "never announced themselves. . . . They just fired." Id. at 138:3–9; see also id. at 82:25–83:2. Once Moore heard the shooting stop, he crawled "to the back of the car," where he was met by a "cop . . . with his gun drawn [to] his face." Id. at 88:2–11. Moore was transported by ambulance to a medical center, and shortly thereafter underwent emergency surgery. Id. at 28:9–19, 31:4–7.

Rush recalled seeing Moore fall to the ground, though he did not know why Moore fell to the ground. See Rush Dep. Tr. at 27:16–18; see also id. at 55:4–5 ("At first I thought he just, like, twisted his ankle or something."). As Rush turned around, he was shot in his left calf, which caused him to fall. Id. at 27:18–20, 49:23–50:3. Rush "limped" back to the car that had dropped him off and was able to "grab the headrest" and "pull [himself] in the car." Id. at 56:5–57:5. He

was then transported to Jersey City Medical Center.  Id. at 28:9–18.  Throughout the incident, Rush claims he never saw the individual Patrolling Officers, but that he observed a police vehicle nearby. Id. at 69:15–70:22.

Rush estimated that he was shooting off his Roman Candle for "[n]ot even a minute" before he was shot.  Id. at 53:11–14.  Moore claims that the entire incident—from the moment Moore exited the car to when the Patrolling Officers stopped discharging their firearms—lasted between approximately five and seven minutes.  Moore Dep. Tr. at 79:23–80:25.

## II.    PROCEDURAL HISTORY

On December 17, 2020, Plaintiffs filed the Complaint alleging (1) deprivation of rights under 42 U.S.C. § 1983 ("Section 1983") against all Defendants ("Count I");   (2) municipal liability under Section 1983 against Jersey City ("Count II"); (3) excessive force under the New Jersey Constitution and N.J.S.A. § 10:6-2 against all Defendants ("Count III"); and (4) common law assault against the Patrolling Officers ("Count IV").  ECF No. 2.  On March 26, 2021, Defendants moved to dismiss Count I against all Defendants, Count II against Jersey City, and all claims against Chief Michael Kelley.  ECF No. 7.  Plaintiffs opposed.  ECF No. 13.

By Order dated October 28, 2021, the Court granted in part and denied in part Defendants' Motion to Dismiss.  See ECF No. 14.  The Court permitted Plaintiffs' Fourth Amendment claim under Count I to continue but dismissed all other alleged constitutional violations.  Id.  The Court also permitted Plaintiffs' municipal liability claim to continue under a failure to train, supervise, investigate, and/or discipline theory, but dismissed Plaintiffs' claims against Chief Kelley.  Id.

Defendants filed the instant Motion for Summary Judgment on March 8, 2024 ("Defs.' Mot."), see ECF No. 42.17, which Plaintiffs oppose ("Pls.' Opp'n"), see ECF No. 46.

11

### III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the Court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).

The Court construes all facts and inferences in the light most favorable to the non-moving party.  Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).  The Court "may not weigh the evidence or make credibility determinations" at the summary judgment stage.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citing First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968)) (internal quotation marks omitted).

### IV.    ANALYSIS

#### A.    Plaintiffs' Fourth Amendment Excessive Force Claim Under 42 U.S.C. § 1983 Against the Patrolling Officers[5]

---

[5] As a point of initial clarification, it appears that Plaintiffs bring an excessive force claim against the Patrolling Officers and Jocelyn Roldan ("Roldan"), and not just the Patrolling Officers.  See Compl. at 15–16.  The Court fails to see how Plaintiffs can maintain an excessive force claim against Roldan, as she was not physically present during the shooting and did not use any force against Plaintiffs.  An individual is liable under Section 1983 only if she "individually participated in the alleged constitutional violation or approved of it."  C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005) (citation omitted).  The record does not show that Roldan "participated in violating [Plaintiffs] rights, or that [s]he directed others to violate them . . . ."  Baker v. Monroe Twp., 50 F.3d 1186, 1190 (3d

Defendants assert that the Patrolling Officers are entitled to qualified immunity for their response to the perceived threat of deadly force. Plaintiffs argue that the Patrolling Officers are not entitled to qualified immunity because they did not face a threat of deadly force, so their use of deadly force was objectively unreasonable. Plaintiffs also argue that Patrolling Officers are not entitled to qualified immunity because certain disputes of material fact preclude finding that their use of deadly force was reasonable here. This Court disagrees.

The doctrine of qualified immunity shields government officials from personal liability in Section 1983 cases where their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." George v. Rehiel, 738 F.3d 562, 572 (3d Cir. 2013) (citation and quotation marks omitted).

Courts must engage in a two-part inquiry to determine whether qualified immunity applies: "(1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation." Gould v. O'Neal, No. 17-100, 2022 WL 354663, at *5 (D.N.J. Feb. 7, 2022) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236 (receding from Saucier v. Katz, 533 U.S. 194 (1998), which mandated that the two prongs be answered sequentially).

---

Cir. 1995). To the extent Plaintiffs' inclusion of Roldan was intentional, Roldan is entitled to summary judgment on Plaintiffs' Fourth Amendment excessive force claim under Section 1983.

### i.    Violation of a Constitutional Right

Excessive force claims are analyzed "under the Fourth Amendment and its 'reasonableness' standard." Davenport v. Borough of Homestead, 870 F.3d 273, 278–79 (3d Cir. 2017) (citing Graham v. Connor, 490 U.S. 386, 39 (1989)).  The standard is an objective one that considers the totality of the circumstances.  See Graham, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97.

"To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." El v. City of Pittsburgh, 975 F.3d 327, 336 (3d Cir. 2020) (quoting Lamont v. New Jersey, 637 F.3d 177, 182–83 (3d Cir. 2011)).  "A seizure occurs '[w]henever an officer restrains the freedom of a person to walk away.'" Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) (alteration in original) (quoting Tennessee v. Garner, 471 U.S. 1, 7 (1985)).  There is no dispute that a seizure occurred here, when the Patrolling Officers shot Plaintiffs.  The relevant inquiry is thus whether the Patrolling Officers' use of force was reasonable under the circumstances.

A seizure is reasonable if the totality of the circumstances justifies the "particular sort" of seizure.  Garner, 471 U.S. at 8–9.  In the context of excess force cases under the Fourth Amendment, this is an objective inquiry.  See Graham, 490 U.S. at 397.  Determining whether force used in a given instance is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (quotations marks omitted).

While the objective reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case," the United States Supreme Court has provided three general factors to guide the Court's inquiry: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; see also Rivas, 365 F.3d at 198.

Other relevant factors are "the physical injury to the plaintiff, the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." El, 975 F.3d at 336 (quotation and citation omitted).

The United States Supreme Court has consistently recognized that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Kisela, 584 U.S. at 103 (internal quotation marks omitted). And courts within the Third Circuit take into account "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force." Rivas, 365 F.3d at 198.

The use of deadly force is justified where an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 11. Where, as here, the proffered justification is self-defense or the defense of others, the threshold inquiry is likewise whether it was "objectively reasonable for an officer" to believe he, she, or they were in danger, "giving due regard to the pressures of the moment." Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999). "[A]n officer who uses deadly force in the mistaken belief that

a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force."  Lamont, 637 F.3d at 183.

### 1.    Initial Use of Deadly Force

Plaintiffs argue that the Patrolling Officers' initial use of deadly force was unreasonable because they did not face a genuine threat of deadly force, and that certain disputes of material fact preclude this Court from finding that they acted objectively reasonable under the circumstances. However, the issue before the Court is not whether the Patrolling Officers were confronted with an actual threat of deadly force, but whether the Patrolling Officers' belief that Plaintiffs posed an immediate threat to their safety and the safety of others at the scene was objectively reasonable.

At summary judgment, Defendants must show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Anderson, 477 U.S. at 247 (quoting Fed. R. Civ. P. 56(c)); Lamont, 637 F.3d at 181 (citation omitted).  Defendants fail to do so here:  Neither the record nor Plaintiffs' version of the events—viewed in a light most favorable to Plaintiffs—undermine the reasonableness of the Patrolling Officers' belief that Plaintiffs were discharging their firearms at them and others nearby, thereby creating a serious threat of imminent danger.

To begin, the "severity of the crime" factor weighs in favor of the Patrolling Officers.  See Graham, 490 U.S. at 396.  It is undisputed that Plaintiffs gathered at Arlington Gardens, a densely populated residential neighborhood, which was dark, not well-lit, and generally known to the Patrolling Officers as having alleged gang activity and crime.[6]  Like firearms, Moore described

---

[6] Moore testified that he did not believe Arlington Gardens to be a violent area in July of 2019, see Moore Dep. Tr. at 83:25–84:17, and that there were no shootings around Arlington Gardens at that time, see id.; see also id. at 138:12–14.  Moore also claimed to be unaware of gang activity out of Arlington Gardens at that time "because everybody was locked up."  Moore Dep. Tr. at 84:13–17.  This testimony does not create a genuine issue of material fact as to the reasonableness of the Patrolling Officers' perception of the neighborhood.  Moore's testimony only goes to his

the Roman Candles as "skinny stick[s]" measuring a "little over a foot" long that "you hold . . . in your hand" and that "shot out sparkles."  Moore Dep. Tr. at 72:4–73:5, 75:3–24.

The Patrolling Officers heard what sounded to them like gunshots, see, e.g., Bereguette Dep. Tr. at 67:14–68:10, 78:8–17, 79:16–23; Jacobo Dep. Tr. at 32:16–19; Vazquez Dep. Tr. at 43:4–44:2; Defs.' SOMF ¶¶ 36, 46, and observed three individuals who appeared to be running away from something as if "the life of the people running past [them] were in danger," see, e.g., Bereguette Dep. Tr. at 80: 18–22; Jacobo Dep. Tr. at 32:19–25, 43:18–44:1; Vazquez Dep. Tr. at 45:19–46:5; Defs.' SOMF ¶¶ 19, 23, 36, 46.  Each of the Patrolling Officers witnessed Moore come into view while holding an unidentified, gun-shaped object that emitted "muzzle flashes," much like those which are emitted from a firearm.  See, e.g., Bereguette Dep. Tr. at 80:23–81:2; Jacobo Dep. Tr. at 32:24–33:11; Vazquez Dep. Tr. at 52:3–9, 53:4–6; Defs.' SOMF ¶¶ 23, 36.

Though a violent crime was not actually occurring, the nature of the suspected criminal activity—a random shooting directed at others and the police in a residential neighborhood—was extremely serious and potentially catastrophic.  Courts within this Circuit have similarly found that a police officer's reasonable belief, albeit a mistaken belief, that a gun is being used in furtherance of a crime, supports a finding that the suspected crime is severe.  See, e.g., Rodriguez v. City of New Brunswick, No. 12-4722, 2017 WL 6442097, at *14 (D.N.J. Dec. 18, 2017) (fake gun firing blanks weighed severity factor in favor of police officers).

The "immediate threat" factor also weighs heavily in favor of the police officers.  See Graham, 490 U.S. at 396; see also, e.g., Lamont, 637 F.3d at 183–84; Conde v. City of Atlantic City, 293 F. Supp. 3d 493, 501–03 (D.N.J. 2017).  In a rapidly evolving situation, the officers

---

perception of the neighborhood at that moment, while the Patrolling Officers' perception of the neighborhood went to their historical assumptions of that area.

heard "popping noises," like gunshots, and saw Moore "point" or "extend" his arm with a gun-shaped object, which emitted flashes of light like a gun when it is discharged. See Bereguette Dep. Tr. at 80:23–81:2; Jacobo Dep. Tr. at 32:24–33:11; Vazquez Dep. Tr. at 53:3–10. Bereguette observed Rush come into view holding a similar object emitting "muzzle flashes" like that seen from Moore. See Bereguette Dep. Tr. at 91:21–25. This series of events happened in short amount of time, requiring the Patrolling Officers to make almost instant decisions, without warning or time to pursue an alternate response.

The Patrolling Officers only raised their firearms after observing Moore holding an object that emitted gun-like flashes of light and sounds resembling gunfire. And the Patrolling Officers only discharged their firearms after they observed Moore move towards them.[7] Once shot, Moore admitted to dropping his Roman Candle, which fired from the ground. Moore Dep. Tr. at 68:1–2. And that same immediate threat materialized with Rush. Following on Moore's heels, Beregutte saw Rush and observed "muzzle flashes" "coming out" of his hands. Bereguette Dep. Tr. at 91:15–92:25. Each of the Patrolling Officers testified as to the immediacy of the circumstances, the rapidly changing environment, and their split-second decision-making, all believing that they were experiencing and/or were the intended recipients of active gunfire.[8]

Although there are some minor questions of fact related to how and where Plaintiffs were pointing their Roman Candles, none are material. Rush admitted to shooting off his Roman Candle for less than a minute before being shot. Rush Dep. Tr. at 25:11–14. Moore could not recall if

---

[7] Bereguette only discharged his firearm once he observed the individual point the unknown object "towards" him. Bereguette Dep. Tr. at 85:12–19. Jacobo only discharged his firearm once he observed the "muzzle flashes turn[] towards [his] direction." Jacobo Dep. Tr. at 41:7–13. Vazquez only discharged his firearm once he observed the individual extend his arm and the object in the direction of Bereguette and Vazquez. Vazquez Dep. Tr. at 54:16–25.

[8] Although Plaintiffs were not actively resisting arrest or attempting to evade arrest, their conduct in moving in the direction of the other individuals who appeared to be "running away from something," see, e.g., Vazquez Dep. Tr. at 45:19–46:5, militates in favor of finding that the Patrolling Officers used reasonable force. And in any event, in this fact-sensitive inquiry, it is one factor of several that the Court considers.

Rush was pointing it at anybody, see Moore Dep. Tr. at 94:4–14, and Rush claims that he and Moore were pointing their Roman Candles toward the sky, see Rush Dep. Tr. at 52:20–24. Moore did not testify as to where he may have been aiming his Roman Candle but denied pointing it "in the direction where the officers were standing." Moore Dep. Tr. at 147:12–16. However, Moore testified that he did not see any of the individual Patrolling Officers prior to being shot. See Moore Dep. Tr. at 82:20–83:7. And Moore admitted that his Roman Candle continued to go off after he was shot. Moore Dep. Tr. at 68:1–2.

Because Plaintiffs' testimony as to how and where they were pointing their Roman Candles is inconsistent, it cannot meaningfully dispute the Patrolling Officers' consistent recollections. It is also immaterial because it is undisputed that Roman Candles make noise when ignited and that Plaintiffs were actively holding and using the Roman Candles, which were roughly shaped like a gun and gave off muzzle flashes like a gun. Whether the firearms were directed at the Patrolling Officers or somewhere else does not alter the reasonableness of the Patrolling Officers' response under the circumstances.[9] But even if the Court credits Plaintiffs' assertions that they were not pointing their Roman Candles at the Patrolling Officers—who Plaintiffs did not even see— Plaintiffs testified that they were chasing, pointing, and shooting Roman Candles at their friends— who had just run past the Patrolling Officers, and whom the officers perceived as "trying to get away." See, e.g., Bereguette Dep. Tr. at 80:18–22. A reasonable police officer could therefore conclude from this chain of events, coupled with what they saw and heard, that Plaintiffs were shooting at the three individuals and then, the Patrolling Officers themselves.

---

[9] It bears noting that Plaintiffs admit that they did not see the Patrolling Officers prior to being shot, see Moore Dep. Tr. at 82:20–83:7, and that all of this occurred within seconds while Plaintiffs were in motion. See, e.g., id. at 93:25–94:3; Rush Dep. Tr. at 68:16–19. It strains logic for this Court to accept that Plaintiffs were not pointing towards the Patrolling Officers if they did not know that the officers were even there.

Defendants also proffered testimony from an expert, which Plaintiffs do not challenge or dispute. Defendants' expert compared the visual similarities and differences between flashes from Roman Candles and muzzle flashes from various firearms.[10] See Expert Report of Dr. Richard Celeste at 63–68, 84, ECF No. 42.15. In his report, Defendants' expert provided photographs of muzzle flashes emanating from different kinds of firearms. See id. at 66–68. Defendants' expert also provided photographs of flashes emanating from ignited Roman Candles, from different angles and with varied picture quality. See id. at 63–65. Comparing the two sets of photographs, Defendants' expert concluded that "it is reasonable to believe that it is difficult, if not impossible, to determine the difference" between flashes emanating from Roman Candles and muzzle flashes emanating from firearms. See id. at 85. This testimony, although certainly not dispositive, serves to corroborate the reasonableness of the Patrolling Officers' perception that they were confronting gunfire.

Under these unfortunate circumstances, which were "tense, uncertain, and rapidly evolving," see Graham, 490 U.S. at 396–97, the Court is satisfied that the Patrolling Officers' belief and resulting conduct was reasonable. Indeed, the Patrolling Officers' conduct was the type of "split-second judgment" that the United States Supreme Court has cautioned against second-guessing "with the 20/20 vision of hindsight." See Kisela, 584 U.S. at 103. The Constitution does not require the Patrolling Officers to wait to determine if they were facing active gunfire—or if they or others were the target of perceived gunfire—before they may act on their reasonable belief that they or others were in immediate danger. See Gardner v. New Jersey State Police, No. 15-08982, 2018 WL 5342715, at *13 (D.N.J. Oct. 29, 2018). If Plaintiffs were in truth armed and

---

[10] Plaintiffs' expert did not opine on the visual similarities or differences between flashes from Roman Candles and muzzle flashes from firearms. See generally Expert Report of Mickie W. McComb, ECF No. 46.6.

actively firing upon the Patrolling Officers or others at the scene, "[w]aiting in such circumstances could well [have] prove[d] fatal. Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution." Lamont, 637 F.3d at 183.

Plaintiffs argue that there are certain other disputes of material fact that would preclude the Court from finding that the Patrolling Officers' use of deadly force was reasonable under the circumstances. First, Plaintiffs posit that the Patrolling Officers' use of deadly force was unreasonable because the Patrolling Officers were made aware of the use of fireworks in the area via radio transmission. See, e.g., Pls.' CSOF at 2. But there is no record evidence to support this. None of the Patrolling Officers testified to this alleged fact in their depositions. To the contrary, each of the Patrolling Officers testified that they could not recall receiving any transmissions concerning the use of fireworks that day. See Bereguette Dep. Tr. at 73:6–8; Jacobo Dep. Tr. at 32:1–4; Vazquez Dep. Tr. at 31:16–32:10.

Similarly, Plaintiffs argue that the Patrolling Officers' use of deadly force was unreasonable because they should have been aware that fireworks were commonly used in this area during this time of year. See, e.g., Pls.' CSOF at 2. By all accounts, the Patrolling Officers were aware that fireworks were used throughout Jersey City around the Independence Day holiday. See Bereguette Dep. Tr. at 71:20–24; Jacobo Dep. Tr. at 27:22–28:18; Vazquez Dep. Tr. at 28:1–9. But there was also evidence that complaints of fireworks turned out to be gunfire. Jacobo Dep. Tr. at 29:6–30:9. Each case involving gunfire or fireworks turns on the specific facts. Here, a careful analysis of the undisputed material facts on the night in question demonstrates that the Patrolling Officers' use of deadly force was reasonable under the circumstances.

### 2.    Continued Use of Deadly Force

Alternatively, Plaintiffs appear to imply that the number of bullets fired by the Patrolling Officers was excessive and therefore unreasonable.  <u>See generally</u> Pls.' Opp'n.  Plaintiffs point to the discharge of twenty-two bullets and argue that Patrolling Officers continued to fire after the threat was over because one bullet struck Moore in his posterior.  <u>See, e.g.</u>, Pls.' Opp'n at 10.  But even if Moore's posterior was hit first, the fact that two subsequent bullets were fired and struck him is not dispositive.[11]  The proper inquiry does not focus on the number of shots fired, but on whether the use of force continues after the threat ends.  <u>See</u> <u>Lamont</u>, 637 F.3d at 184 ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.").

The bullets were fired by each Patrolling Officer simultaneously and in rapid succession. Each of the Patrolling Officers claim to have stopped firing once Moore dropped his hand, dropped to the ground, or disappeared out of view.  <u>See</u> Bereguette Dep. Tr. at 90:25–91:14; Jacobo Dep. Tr. at 35:12–14, 37:23–38:5; Vazquez Dep. Tr. at 68:3–13, 68:14–18.  And even though Moore dropped his Roman Candle upon being hit, Moore conceded that his Roman Candle continued to fire once on the ground.  Moore Dep. Tr. at 106:10–15. It would have been reasonable for the Patrolling Officers to perceive the continuation of Moore's Roman Candle flashes as the continuation of gunfire.

This is not a case where numerous bullets struck Moore from behind.  <u>See</u> <u>Lamont</u>, 637 F.3d at 184 (finding force excessive when "11 of the 18 bullets that struck [the suspect] hit him from behind"); <u>Duvall v. Hustler</u>, 447 F. Supp. 3d 311, 329 (E.D. Pa. 2020) (finding force excessive when "[t]welve of the twenty-five bullets that struck [the suspect] hit him from behind,"

---

[11] Rush, on the other hand, was struck only once in his left calf and limped to the car and exited the scene.

and two bullets hit the soles of the suspect's feet). Like the initial use of force, the undisputed facts demonstrate that the Patrolling Officers' purportedly continuous use of force was reasonable under the circumstances.

### ii. Clear Establishment of Right

Even if a constitutional violation had occurred, the Patrolling Officers did not violate a clearly established right. To determine whether a right was "clearly established," courts must conduct a two-part inquiry. Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021). First, courts must "define the right allegedly violated at the appropriate level of specificity." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012). Second, courts must ask whether that right was "clearly established" at the time of its alleged violation, such that the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Kisela, 584 U.S. at 104 (quotation marks omitted). Qualified immunity accordingly protects "all but the plainly incompetent or those who knowingly violate the law." Id. (quotation marks omitted).

The United States Supreme Court has noted that "clearly established law should not be defined at a high level of generality" and instead requires precedent that is "particularized to the facts of the case." White v. Pauly, 580 U.S. 73, 79 (2017) (quotation marks omitted). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force" by providing an actor with notice that "a specific use of force is unlawful." Kisela, 584 U.S. at 105 (quotation marks omitted).

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing

23

precedent squarely governs the specific facts at issue." Id. (quotation marks omitted). "Where constitutional guidelines seem inapplicable or too remote," it is improper for a court to deny qualified immunity and order that the case be tried "on the question of reasonableness." Id.

It is well-established that use of deadly force is justified only when an officer "has probable cause to believe that the suspect poses a threat of serious physical harm" to the officer or to others. Garner, 471 U.S. at 11. But the Supreme Court has explicitly held that the general principles articulated in Garner and its progeny are typically insufficient to give rise to a clearly established right. See, e.g., White, 580 U.S. at 80 (reiterating holding that "Garner and Graham do not by themselves create clearly established law outside 'an obvious case'" (citation omitted)).

Here, Plaintiffs did not even attempt to define the right that the Patrolling Officers allegedly violated with requisite particularity. Defendants define the right, not from a constitutional perspective, but rather as Plaintiffs' "right to illegally possess and shoot fireworks at each other and in the direction of officers, such that their actions would not be subject to reasonable scrutiny by others or responding police officers." Defs.' Mot. at 10–11. The Court here frames the issue as whether, on July 1, 2019, the law was clearly established such that police officers who, after observing individuals fleeing in a high crime area, hearing what they perceived as gunshots, and seeing muzzles flashes and a gun-shaped objected pointed towards them, acted reasonably in their use of deadly force to eliminate a potential threat of deadly harm to themselves or others. The Court finds that it was not.

Neither Plaintiffs nor Defendants cite to a single analogous case to support the conclusion that the Patrolling Officers' actions violated a clearly established right. And the Court is unaware of any precedent in this Circuit or elsewhere finding a constitutional violation when deadly force is used in response to a police officer's reasonable belief that individuals were armed and firing

upon them or others.  To the contrary, this Circuit and others have repeatedly held that a police officer's use of deadly force is reasonable when the police officer reasonably believes an individual was attempting to use or reach for a deadly weapon.  See, e.g., Curley v. Klem, 499 F.3d 199, 206– 12 (3d Cir. 2007); Lamont, 637 F.3d at 183–84; Valderas v. City of Lubbock, 937 F.3d 384, 390 (5th Cir. 2019); Anderson v. Russell, 247 F.3d 125, 132–33 (4th Cir. 2001); Krueger v. Fuhr, 991 F.2d 435, 439 (8th Cir. 1993).

Thus, there is no established precedent which would have placed the Patrolling Officers on notice that their use of force under the circumstances—patrolling a high crime area, observing an apparent chase, hearing gunshots, seeing muzzle flashes, and perceiving an individual discharging a firearm towards them or another—was a constitutional violation.  In the absence of precedent that is more "particularized to the facts of the case," see White, 580 U.S. at 79, the Court finds that the Patrolling Officers did not violate a clearly established right.

The Patrolling Officers are accordingly entitled to qualified immunity and summary judgment is granted as to Count I.

### iii.    Plaintiffs' Municipal Liability Claim Under 42 U.S.C. § 1983 Against Jersey City

Plaintiffs allege that Jersey City violated Section 1983 by failing to train and supervise its police officers in the use of force and by failing to properly investigate and discipline its police officers.  See generally Pls.' Opp'n.  Plaintiffs also appear to allege that Jersey City's failure to train its police officers is tantamount to an unconstitutional custom and/or an unconstitutional policy.  Pls.' Opp'n at 21–23.  Defendants disagree and point to the absence of evidence in support of Plaintiffs' claim.

Municipal liability under Section 1983 requires an underlying constitutional violation. Ford v. County of Hudson, 729 F. App'x 188, 196 n.4 (3d Cir. 2018) (citing Brown v.

Commonwealth of Pa. Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003)); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).  As set forth above, this Court found no constitutional violation here.  Therefore, summary judgment is granted as to Count II.

<b>iv.    Plaintiffs Remaining State Law Claims</b>

Since the Court previously dismissed all federal claims against Defendants, the only counts now remaining in this case are Plaintiffs' state law claims.  Count III of Plaintiffs' Complaint alleges the use of excessive force by the Defendants in violation of "the New Jersey Constitution and N.J.S.A. 10:6-2."  Compl. ¶¶ 95–100.[12]  And Count IV of Plaintiffs' Complaint alleges common law assault by the Patrolling Officers.  See Compl. ¶¶ 101–105.  Although Defendants move for dismissal of Count III, see Defs.' Mot. at 6–8, they do not appear to specifically address Count IV,[13] see generally Defs.' Mot.  However, the Court need not reach the merits of these claims at this stage because the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

Supplemental jurisdiction is governed by 28 U.S.C. § 1367, which grants federal courts "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  As Plaintiffs do not allege diversity of citizenship, see generally Compl., the Court no longer has original jurisdiction over this matter and

---

[12] While Count III appears to expand the grounds for these allegations on broader violations of "the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. § 1983, the Constitution of the State of New Jersey and the Law of the State of New Jersey including, but not limited to, the New Jersey Civil Rights Act," see Compl. ¶ 97, Plaintiffs' Opposition to Defendants' Motion to Dismiss, ECF No. 13, clarifies that Plaintiffs bring state law claims pursuant to the New Jersey Civil Rights Act and the New Jersey Tort Claims Act.

[13] Defendants make a vague reference of their intent to dismiss Plaintiffs' Complaint "in its entirety," see Defs.' Reply at 1, 3, ECF No. 49, but do not substantively address the remaining common law claim.

must consider whether to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, see id. § 1367(c). The Court's decision to exercise supplemental jurisdiction is discretionary. See City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 172 (1997).

The Third Circuit has generally established that a court may decline supplemental jurisdiction when federal claims are dismissed by way of summary judgment. See Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976) ("If it appears that the federal claim . . . could be disposed of on a motion for summary judgment under [Federal Rule of Civil Procedure 56], then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances."); Simmerman v. Corino, 804 F. Supp. 644, 658 (D.N.J. 1992), aff'd, 16 F.3d 405 (3d Cir. 1993) (same).

Accordingly, this Court declines to exercise supplemental jurisdiction over all remaining state law claims and therefore dismisses them.

**v.    CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 42, is **GRANTED**.


Date: November 6, 2024                    *s/ Madeline Cox Arleo*
                                          **Hon. Madeline Cox Arleo**
                                          **UNITED STATES DISTRICT JUDGE**